*UNITED STATES DISTRICT COURT*
*DISTRICT OF NEW JERSEY*

---

UNITED STATES OF AMERICA ex rel.
KEITH A. DiLELLO, SR., STATE OF NEW
JERSEY ex rel. KEITH A. DiLELLO, SR.

             Plaintiff

v.

HACKENSACK MERIDIAN HEALTH,
JERSEY SHORE UNIVERSITY MEDICAL
CENTER, OCEAN MEDICAL CENTER,
SEAVIEW ORTHOPAEDICS,
SHREWSBURY SURGERY CENTER,
KESSLER REHABILITATION, DR.
HALAMBROS DEMETRIADES, DR.
THEODORE KUTZAN, DR. ADAM MYERS,
DR. HOAN-VU NGUYEN, DR. FREDERICK
DE PAOLA, ABC CORPORATIONS 1-10
(said names being fictitious) JOHN/JANE
DOES 1-10 (said names being fictitious)

COMPLAINT AND PLAINTIFF'S
DEMAND FOR A JURY TRIAL

Civil Case No.:

**DO NOT PLACE IN PRESS BOX**

**DO NOT ENTER ON PACER**

---

*FALSE CLAIMS ACT COMPLAINT*
*AND DEMAND FOR JURY TRIAL*

### *INTRODUCTION*

1. The Relator, Keith A. DiLello, Sr., is the original source of the facts and information

hereinafter set forth concerning the activities of the various defendants. The facts averred

herein are based upon the direct, independent and personal knowledge, and also upon

1

various documents viewed by or in the possession of the Relator.  The Relator is a New Jersey resident.

2.  The Relator files this original petition under seal, on his behalf and on behalf of the United States of America and the State of New Jersey.  The Relator brings this action seeking to obtain compensatory, punitive and other damages, restitution, reimbursement and civil penalties under applicable law and other equitable and legal relief against the defendants.  .

3.  The defendants have systematically violated 33 U.S.C. 1251 et. seq., the False Claims Act ("FCA") 31 U.S.C. 3729 et. seq. and the New Jersey False Claims Act ("NJFCA") N.J.S.A. 2A:32C-1 et. seq.

4.  It is believed that the defendants routinely engage in an illegal scheme by which they submit medical bills to New Jersey insurers and the Center for Medicare and Medicaid Services ("CMS") for the same, or included, medical treatment.

5.  It is believed that the various defendants herein attempt to "mask" the fraudulent activity by billing through P.O. Boxes in Massachusetts.

### *PARTIES*

1. Plaintiff/Relator, Keith A. DiLello, Sr., is a resident of the State of New Jersey, currently residing at 98 Ridge Avenue, Neptune City, Monmouth County, New Jersey 07753.

2. Hackensack Meridian Health ("HMH"), a New Jersey Health "System" has an address of 30 Prospect Avenue, Hackensack, New Jersey 07601; Jersey Shore University Medical Center ("JSUMC") is located at 1945 Route 33, Neptune, New Jersey 07753 and Ocean Medical Center ("OMC") lists their address as 425 Jack Martin Boulevard, Brick Township, New Jersey 08724.

3. Hackensack Meridian Health ("HMH") lists Jersey Shore University Medical Center ("JSUMC") and Ocean Medical Center ("OMC") among their fourteen (14) hospitals.

4. The HMH website counts 342 "employed physician practice locations", 4 rehabilitation facilities, 2 behavioral health facilities, 3 assisted living facilities, 13 long term care facilities and 11 Urgent Care facilities along with the 14 hospitals as part of the system. Additionally, the 2018 Annual Report touts $6 billion in revenue, 35,343 employees ("team members"), 7,202 physicians and 184,845 patient admissions to express the size and extent of the overall integrated health care business. https://www.hackensackmeridianhealth.org.

5. Shrewsbury Surgery Center is located at 655 Shrewsbury Avenue, Shrewsbury, New Jersey 07702.

6. Seaview Orthopedics is a group of physicians with various locations in New Jersey.

7. Halambros Demetriades is a doctor with Seaview Orthopaedics.

8. Theodore Kutzan is believed to be an anesthesiologist at Shrewsbury Surgery Center.

9. Adam Myers is believed to be a doctor with Seaview Orthopaedics.

10. Hoan-Vu Nguyen is believed to be a doctor with Seaview Orthopaedics.

11. Frederick DePaola is believed to be a doctor with Seaview Orthopaedics.

12. ABC CORPORATIONS 1-10 are fictitious corporations, the true names of which are not currently known but may have participated in the action alleged.

13. JOHN DOES 1-10 are fictitious individuals, the true names of which are not currently known but may have participated in the action alleged.

## JURISDICTION

14. This action arises under the False Claims Act, 31 U.S.C. § 3729 et seq. This court has subject matter jurisdiction over the case pursuant to 31 U.S.C. § 3732(a).

15. This court has jurisdiction over defendants violation of the New Jersey False Claims Act (hereinafter "NJFCA") N.J.S.A. 2A:32C-1 et seq. as the violations of New Jersey law and the violation of federal law arise from the same transactions, occurrences and scheme.

Further, the court has jurisdiction under N.J.S.A. 2A:32C-5a providing that a violation of the NJFCA may be brought in state or federal court.

16. The court has personal jurisdiction over the defendants by and through the defendants' residence and/or permanent and continuous contacts with the state of New Jersey.

## VENUE

17. Venue is proper in this district pursuant to (a) 31 U.S.C. § 3732(a) as the acts complained of and enumerated herein took place within this district; (b) 20 U.S.C. § 1391(b) and (c) because at all times herein relevant, the defendants could be found, resided and/or transacted business in this district.

## BACKGROUND

18. The Relator was involved in an automobile accident on or about September 5, 2014.

19. At the time of the automobile accident, the Relator was covered for medical expenses arising from the automobile accident by New Jersey Manufacturers ("NJM"). The coverage afforded New Jersey residents involved in automobile accidents is referred to as Personal Injury Protection ("PIP") benefits.

20. The Relator was transported by Oakhurst E.M.S. to JSUMC in Neptune, New Jersey. The hospital, JSUMC, is one of the medical centers in the HMH system.

21. Beginning on September 5, 2014 (the date of the Relator's automobile accident), and continuing for roughly three (3) years thereafter, the Relator was treated by various health professionals for injuries sustained on September 5, 2014.

22. Unbeknownst to the Relator, various health providers including the providers named herein (and there may be others) BILLED and RECEIVED payment for procedures from BOTH CMS AND NJM for the exact dates and times.

23. The Relator has noticed, through Explanation of Benefits notifications, that the named entities have "double billed". Specifically, the providers have sent bills to both CMS and NJM.

24. Compounding the difficulties for the Relator is the fact that CMS is now requesting repayment from the Relator due to a personal injury recovery in the automobile accident. CMS is demanding repayment for monies that a) should never have been billed to CMS and b) have been effectively paid twice by CMS and NJM. CMS is legally permitted to recover the money. However, rather than have the bills paid by NJM, the money will have to be repaid from the settlement in the personal injury case.

25. On the date of the automobile accident, the Relator was admitted to JSUMC and remained there for three days.

26. JSUMC billed NJM (the personal injury protection (PIP) insurer for the Relator's automobile) and CMS. JSUMC billed both providers $30,623.00 each for the hospital stay.

27. NJM paid $19,106.91 for the billed amount of $30,623.00 for the hospital stay.

28. CMS paid $23,352.91 for the billed amount of $30,623.00 for the hospital stay.

29. JSUMC should not have billed CMS pursuant to 42 U.S.C. 1395y(b)(2)(A)(ii) at all. JSUMC caused a claim to be submitted to CMS which violated the Medicare Secondary Payor Act. Further, after NJM paid for the hospital stay, JSUMC and/or HMH should have returned the CMS payment.

30. It appears from the payout ledgers of NJM and CMS that JSUMC was paid somewhere around $42,459.82 for services they billed a total of $30,623.00. CMS should not have been billed for treatment arising out of an automobile accident. It is believed that the named providers bill both the PIP carrier and CMS routinely.

31. In spite of this apparent 38% OVERPAYMENT, JSUMC and/or HMH have done nothing to determine why and how such an overpayment occurred. With the current national focus on healthcare costs, it is difficult to imagine a hospital not being aware of a 38% overpayment.

32. JSUMC and/or HMH had an affirmative obligation to return the "conditional payment". 42 U.S.C. 1395y(6)(2)(b)(i)-(I) (A secondary payor requirement may also apply; 42 U.S.C. 1396(k)(a)(i), 1396a(a)(25).).

33. Quite simply, billing CMS in the first place is a violation of the law, and thereafter, accepting and failing to return payment from CMS constitutes a separate violation of the law.

34. The Relator underwent a surgical procedure at Ocean Medical Center ("OMC") on September 16, 2015, approximately one year after his automobile accident.

35. OMC billed NJM and CMS $141,337.00 each for the procedure.

36. NJM paid $34,634.82 for the September 16, 2015 procedure.

37. CMS should not have been billed for the September 16, 2015 procedure. Further, when OMC received two payments, the payment by CMS should have been returned pursuant to the above noted statutory provisions.

38. It is believed that OMC, along with JSUMC, is billed in the same exact way utilizing HMH systems and procedures.  It is believed that all entities in the "system" bill in the same illegal manner.

39. Interestingly, as noted in the attached Explanation of Benefits form received by the Relator, JSUMC and OMC have "payment" addresses at post office boxes in Boston, Massachusetts.

40. It has been determined that the P.O. Boxes in Boston, Massachusetts listed for JSUMC, OMC and other health care providers herein, are rented by Bank of America.

41. It is believed that Bank of America is the payment processor for the HMH Systems. This belief is due to the fact that payments for HMH bills are sent to a P.O. Box rented by Bank of America.

42. In reviewing the attached PIP register (Exhibit "A") and the partial CMS register (Exhibit "B"), the following entities improperly billed CMS for healthcare involving the Relator's automobile accident:

    a. JSUMC billed CMS $30,623.00 for treatment dates of 9/5/2014 – 9/8/2014 and also billed NJM $30,623.00. CMS paid a total of $23,352.91 and NJM paid $19,106.91.

    b. Kessler Institute for Rehabilitation billed CMS for the treatment date of 11/5/2014 in the amount of $237.40 and billed NJM in the amount of $237.40 for the same date of service. NJM paid $42.00 after applying a $10.50 co-pay. CMS paid $10.28 for the same date. Interestingly, Kessler is now listed as part of the HMH "system". Regardless, Kessler should not even have billed CMS when NJM provided coverage.

    c. Dr. Corey Smith billed CMS $1,500.00 for a 9/7/2014 date of service. Dr. Smith does not appear to have separately billed NJM under his own name. Dr. Smith was paid $141.91 for this date of service. This date was the date the Relator arrived at the hospital, JSUMC. Dr. Smith was, at one time, employed by JSUMC and has been the recipient of the JSUMC "Physician of the Year Award".

Regardless, Smith should not even have billed CMS when NJM provided coverage.

d.  Dr. Demetriades billed CMS $215.00 for a 10/14/2014 date of service.  CMS paid $21.50.  Seaview Orthopaedics billed NJM $215.00 for the same date of service. NJM paid $87.78.  Dr. Demetriades is employed by Seaview Orthopaedics. Regardless, Demetriades should not even have billed CMS when NJM provided coverage.

e.  Dr. Theodore E. Kutzan billed CMS $1,750.00 for an 11/3/2014 date of service. CMS paid $113.05.   Shrewsbury Ambulatory Anesthesia, LLC billed NJM $1,750.00 for an 11/3/2014 date of service.  NJM paid $472.42.  Dr. Kutzan is believed to be employed at Shrewsbury Ambulatory Anesthesia. Regardless, Kutzan should not even have billed CMS when NJM provided coverage.

f.  Dr. Adam M. Meyers billed CMS $3,800.00 for an 11/3/2014 procedure.  CMS paid $117.35.   Seaview Orthopaedics billed NJM $4,750.00 for an 11/3/2014 date of service.  NJM paid $478.96.  D. Meyers appears to be employed by Seaview Orthopaedics. Regardless, Meyers should not even have billed CMS when NJM provided coverage.

g.  Dr. Demetriades billed CMS $265.00 for an 11/11/2014 date of service.  CMS paid $34.12.  Seaview Orthopaedics billed NJM $310.00 for the same date of service.  NJM paid $139.26.  As noted above, Dr. Demetriades appears to be

employed by Seaview Orthopaedics. Regardless, Demetriades should not even have billed CMS when NJM provided coverage.

h.  Dr. Meyers billed CMS $120.35 for an 11/21/2014 date of service. CMS paid $21.50. Seaview Orthopaedics billed NJM $310.00 AND $120.35 for an 11/21/2014 date of service. NJM paid $139.26 and $87.78 respectively. Dr. Meyers appears to be employed by Seaview Orthopaedics. Regardless, Meyers should not even have billed CMS when NJM provided coverage.

i.  Shrewsbury Surgery Center billed CMS $3,337.00 for a 12/8/2014 date of service. CMS paid $63.80. Shrewsbury Surgery Center billed NJM $6,674.00 for the same date of service. NJM paid $1,192.83. Regardless, Shrewsbury Surgery Center should not even have billed CMS when NJM provided coverage.

j.  Dr. Leonard Zawodriak billed CMS $1,495.00 for a 1/20/2015 date of service. Dr. Zawodriak is a radiologist. There does not appear to be a corresponding charge for this date to NJM. However, CMS has claimed that the charge is related to the automobile accident and is looking to be repaid. Regardless, Zawodriak should not even have billed CMS when NJM provided coverage.

k.  Dr. Hoan-Vu Nguyen billed CMS $2,800.00 and $700.00 for a 9/16/2015 date of service. CMS paid $7.43 for the second charge and nothing for the first. Seaview Orthopaedics billed NJM $9,100.00 and $10,000.00. NJM paid $1,167.97 and $6,870.40 respectively. This date of service is the same date as OMC billed NJM

$141,337.00 and was paid $34,634.82. Regardless, Nguyen should not even have billed CMS when NJM provided coverage.

*l.* Drs. Yadilla, Harrigan and DePaola billed CMS for dates of service in 2018. CMS is claiming these events are related to the automobile accident and is seeking repayment. Regardless, Yadilla, Harrigan and DePaola should not even have billed CMS when NJM provided coverage.

43. In reviewing the above, note that regardless of whether NJM paid any amount, the entities should not have billed CMS at all.

44. The PIP register from NJM is attached as Exhibit "A".

45. Pages 5, 7 and 9 from the CMS "Payment Summary Form" are attached as Exhibit "B". The summary appears to show that CMS has paid $38,390.38 on behalf of the Relator herein.

46. Three different "Explanation of PIP Benefits" forms are attached as Exhibit "C". The first two pages reference the same payment by NJM on behalf of the Relator to JSUMC. Note that the second document shows payment sent to P.O. Box 416765 in Boston, MA 02241. Box 416765 is rented by Bank of America. The third document of Exhibit "C" shows payment to OMC sent to a P.O. Box 416801, Boston, MA 02241. Box 416801 is rented by Bank of America.

## *APPLICABLE LAW*

### *Background on Federal and State-Funded Health Insurance Programs*

47. In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare Programs.

48. Medicare provides health insurance to people age 65 or older, people under 65 with certain disabilities and people of all ages with end-stage renal disease.

49. Payments from the Medicare Program come from a trust fund – known as the Medicare Trust Fund – which is funded through payroll deductions taken from the work force, in addition to government contributions.

50. The Medicare Program is administered through the United States Department of Health and Human Services ("HHS") and, specifically, the Centers for Medicare and Medicaid Services ("CMS") , an agency of HHS.

51. Much of the daily administration and operation of the Medicare Program is managed through private insurers under contract with the federal government.

52. Under Medicare Part A, contractors serve as "fiscal intermediaries," administering Medicare in accordance with rules developed by the Health Care Financing Administration, now known as the CMS.

53. Under Medicare Part B, the federal government contracts with insurance companies and other organizations known as "carriers" to handle payment for physicians'

13

services in specific geographic areas. These private insurance companies, or "Medicare Carriers" are charged with and responsible for accepting Medicare claims, determining coverage and making payments from the Medicare Trust Fund.

54. The principal function of both intermediaries and carriers is to make and audit payments from Medicare services to assure that federal funds are spent properly.

55. To participate in Medicare, providers must assure that their services are provided economically and are medically necessary. Medicare will reimburse costs for medical services that are needed for the prevention, diagnosis or treatment of a specific illness or injury.

56. Medicaid was created in 1965, at the same time as Medicare, when Title XIX was added to the Social Security Act.

57. Medicaid aids the states in furnishing medical assistance to eligible, needy persons, including indigent and disabled persons.

58. Medicaid is the largest source of funding for medical and health-related services for America's poorest people.

59. Medicaid is a cooperative federal-state public assistance program that is administered by the states.

60. The New Jersey Medical Assistance and Health Services Program (New Jersey Medicaid) is administered by the New Jersey Department of Human Services

("NJDHS"), and, specifically, by the Division of Medical Assistance and Health Services ("DMAHS"). DMAHS is an agency of NJDHS.

61. Funding for Medicaid is shared between the federal government and those state governments that choose to participate in the program.

62. Title XIX of the Social Security Act allows considerable flexibility within each State's Medicaid plan and, therefore, specific Medicaid coverage and eligibility guidelines vary from state to state.

63. However, in order to receive federal matching funds, a state Medicaid program must meet certain minimum coverage and eligibility standards.

*New Jersey Auto Insurance Law*

64. In 1972, the New Jersey Legislature enacted the New Jersey Automobile Reparation Reform Act, commonly referred to as the "No Fault" law or act, N.J.S. 39:6A-1, *et seq.*

65. Under the 1972 statute, all insurance policies written for private passenger vehicles are required to provide enumerated personal injury protection ("PIP") benefits to certain classes of persons without regard to who was at fault for causing the motor vehicle accident. Id.

66. PIP benefits, which include medical benefits, are used to pay medical and other related expenses incurred by the insured as a result of a motor vehicle accident.

67. In 1990, the New Jersey Legislature enacted the Fair Insurance Reform Act.

68. The Fair Insurance Reform Act of 1990 requires insurers to provide an option for insureds to have their health insurance, including insurance from a federal or state program, be primarily responsible for payment of PIP-like benefits. N.J.S. 39:6A-4.2 and 39:6A-4.3. This option is often referred to as the "health first option". In order to avoid coverage disputes, N.J.A.C. 11:3-14.5(b) requires written information identifying the health insurer providing primary PIP medical expense benefits.

69. When the insured choses this option, an insurance company like Progressive is only secondarily liable for medical expenses under the terms of the insurance contract.

70. Pursuant to the statutory language and guidelines provided by New Jersey's Department of Banking and Insurance, an insured can choose to have virtually any health insurance carrier be primary payer of PIP benefits, including federal or state programs, BUT NOT Medicare or Medicaid. N.J.A.C. 11:3-14.5(a).

*Medicare Secondary Payer Law*

71. In certain cases, an individual who is eligible for Medicare coverage also has coverage through an auto insurance policy providing no-fault medical benefits.

72. Congress endeavored to coordinate payment in situations in which an individual has overlapping Medicare benefits and private insurance coverage by enacting the Medicare Secondary Payer ("MSP") statute in 1980. 42 U.S.C. § 1395y, *et seq.*

73. The MSP statute and related regulations dictate when Medicare will pay a medical claim as the "primary payer" and when Medicare will pay as a "secondary payer".

Generally, under the MSP statute and related regulations, the private insurance carrier is always the primary payer. See e.g., 42 U.S.C. § 1395y(b)(1)(A),(B); 42 C.F.R. §§ 411.172, 411.101, 411.203.

74. The CMS has provided guidelines on when Medicare will pay medical benefits when no-fault auto insurance coverage is also available.

75. The CMS has promulgated the following guideline: "Under § 1862(b)(2) of the Act, 42 U.S.C. 1395y(b)(1), Medicare does not make payment for covered items or services to the extent that payment has been made, or can be reasonably expected to be made under no-fault insurance. Medicare is secondary to no-fault insurance even if State law or a private contract of insurance stipulates that its benefits are secondary to Medicare benefits or otherwise limits its payments to Medicare beneficiaries..." *Medicare Secondary Payer (MSP) Manual,* Chapter 2 – MSP Provisions, Section 60 – No-Fault Insurance (Rev. 49 Issued: April 07, 2006; Effective/Implementation: May 08, 2006).

76. Medicare is liable for claims stemming from a motor vehicle accident *only* when the no-fault insurance coverage, such as PIP, has exhausted.

### *Medicaid Secondary Payer Law*

77. Just like Medicare, Medicaid is generally considered the payer of last resort, 42 C.F.R. § 433.135, *et seq.*

78. Section 433 of Title 42 regulates State fiscal activities with respect to state-ran Medicaid programs. 42 C.F.R. § 433.1.

79. Subpart D ("Third Party Liability") concerns the liability of third parties, such as commercial insurance companies, with respect to claims submitted to a Medicaid program for payment. 42 C.F.R. § 433.135, *et seq.*

80. Similar to the MSP statute, federal regulations ensures that Medicaid is secondary to other available sources of insurance benefits, including no-fault auto insurance benefits like PIP. 42 C.F.R. § 433.139.

*New Jersey Secondary Payer Law*

81. New Jersey's "health first option" was enacted ten years after the MSP statute and 42 C.F.R. § 433. Not surprisingly, the statute considers the secondary status of Medicare and Medicaid. The statute expressly provides, "this option shall not apply to any coverage or benefits provided pursuant to Medicare or Medicaid." N.J.A.C. 11:3-14.5(a).

82. Pursuant to the statute's language, it is illegal under New Jersey law to bill Medicare and Medicaid as primary under the terms of an auto insurance policy. N.J.A.C. 11:3-14.5(a).

83. New Jersey's Department of Insurance has advised that an insured "cannot select Medicare or Medicaid as your primary health insurer for auto accidents."

### *The Federal False Claims Act*

84. The FCA provides for liability for treble damages and penalties on a per claim basis for anyone who knowingly submits or *causes the submission* of a false or fraudulent claim to the United States.

85. The FCA extends civil liability to any person who: (1) knowingly presents, or causes to be presented, to an officer or employee of the United States government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses or causes to be made or used, a false record or statement to get a false claim or fraudulent claim paid or approved by the government; (3) conspires to defraud the government by getting a false or fraudulent claim allowed or paid. 31 U.S.C.S. § 3729(a).

86. To establish a prima facie case under 31 U.S.C.S. § 3729(a)(1) of the FCA, the United States must prove: (1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent.  Under the FCA, 31 U.S.C.S. § 3729 *et seq.,* a claim includes any request or demand for money from the United States government. 31 U.S.C.S. § 3729(c).

87. In the context of the FCA, the term "knowingly" is defined as follows: "knowing" and "knowingly" mean that a person, with respect to information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of

the information; or (3) acts in reckless disregard of the truth or falsity of the information; and no proof of specific intent to defraud is required. 31 U.S.C. § 3729(b).

88. The Supreme Court has held that the FCA is intended to reach all types of fraud, without qualification, that might result in financial loss to the government and reaches beyond "claims" that might be legally enforced, to all fraudulent attempts to cause the government to pay out sums of money, and therefore, the term "false or fraudulent claim" should be construed broadly. *United States v. Neifert-White Co.,* 390 U.S. 228, 232-33 (1968).

89. The "usual" *qui tam* action is filed by an insider at a private company who discovers his employer has overcharged under a government contract, however, courts have been willing to entertain FCA actions under numerous alternative theories. *United States ex rel. Hopper v. Anton,* 91 F3d 1261, 1266 (9th Cir. 1996).

90. The Third Circuit has also recognized FCA liability in cases in which a "defendant causes, or will cause, [an] intermediary to make a false claim against the government resulting in a financial loss to the treasury". *Hutchins*, 253 F.2d at 185; *see e.g., United States v. Bornstein,* 423 U.S. 303, 309, 96 S. Ct. 523, 46 L. Ed. 2d 514 (1976).

91. The United States District Court for the Eastern District of Pennsylvania has already addressed FCA liability under the MSP in *United States ex rel. Drescher v. Highmark, Inc.* , 305 F. Supp. 2d 451 (E.D. Pa. 2004).  In denying the defendant's

12(b)(6) motion to dismiss, the District Court held that FCA liability may be triggered when a private insurance company  causes a medical provider to submit a claim to Medicare as the purported primary payer. Id. At 461.

### New Jersey's False Claims Act

92. The NJFCA was enacted in 2008 and became effective on March 13, 2008.

93. The NJFCA is modeled after the federal FCA.

94. The NJFCA provides, in pertinent part: (a) a person who (1) knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval; (2) knowingly makes, uses or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State; or (3) conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State; is jointly and severally liable to the State for a civil penalty of not less than and not more than the civil penalty allowed under the federal FCA. NJFCA § 2A:32C-3.a, et seq.

95. Under the NJFCA, the term "knowingly" is defined as follows: "knowing" and "knowingly" mean that a person, with respect to information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the

21

information, and no proof of specific intent to defraud is required. NJFCA § 2A:32C-2.

96. Equal to the FCA, the NJFCA provides for liability for treble damages and penalties for anyone who knowingly submits or *causes the submission* of a false or fraudulent claim to the United States.

### *FIRST COUNT*

### *VIOLATION OF THE FEDERAL FALSE CLAIMS ACT*

1. Relator incorporates by reference all of the preceding paragraphs as if more fully set forth herein.

2. Relator seeks relief against the various defendants pursuant to the False Claims Act, 31 U.S.C. § 3729(a) et seq.

3. As set forth in the preceding paragraphs, the various defendants "knowingly made, used or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government" by billing CMS for medical treatment related to an automobile accident.

4. The defendants have violated the FCA by a) billing CMS when other insurance is available and b) by failing to return payment to CMS after payment by the "other insurance".

5. By reason of these false claims, the United States has sustained damages in an amount to be determined at trial.

6. By reason of these false claims, the defendants should be obligated to pay, pursuant to the provisions of the False Claims Act, a penalty amount to be determined by the court for each and every violation.

7. Defendants should be obligated to pay treble damages pursuant to the Act in addition to the penalty statutorily imposed per transaction.

## *SECOND COUNT*

### *CONSPIRACY TO VIOLATE THE FEDERAL FALSE CLAIMS ACT*

1. Relator incorporates by reference all of the preceding paragraphs as if more fully set forth herein.

2. As set forth in the preceding paragraphs, the defendants have conspired with each other to defraud the United States when they "knowingly made, used or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government".

3. The defendants have violated the FCA by a) billing CMS when other insurance is available and b) by failing to return payment to CMS after payment by the "other insurance".

23

4. By reason of these false claims, the United States has sustained damages in an amount to be determined at trial.

5. By reason of these false claims, the defendants should be obligated to pay, pursuant to the provisions of the False Claims Act, a penalty amount to be determined by the court for each and every violation.

6. Defendants should be obligated to pay treble damages pursuant to the Act in addition to the penalty statutorily imposed per transaction.

### *THIRD COUNT*

### *NEW JERSEY FALSE CLAIMS ACT*

1. Relator incorporates by reference all of the preceding paragraphs as if more fully set forth herein.

2. Relator seeks relief against the various defendants pursuant to the New Jersey False Claims Act, specifically, N.J.S.A. 2A:32C-1 et seq.

3. As set forth in the preceding paragraphs, the defendants are liable to the state for treble damages and a civil penalty of not less than and not more than the civil penalty allowed pursuant to the Federal False Claims Act in that they either had possession, custody or control of public property and money used or to be used by the State of New Jersey or knowingly presented or caused to be presented a false

24

or fraudulent claim for payment or approval or violated some other sub-section of N.J.S.A. 2A:32C-3.

4. The defendants have violated the FCA by a) billing CMS when other insurance is available and b) by failing to return payment to CMS after payment by the "other insurance".

5. By reason of these false claims, the state of New Jersey has sustained damaged in an amount to be determined at trial.

6. By reason of these false claims, the defendants should be obligated to pay, pursuant to the provisions of the False Claims Act, a penalty amount to be determined by the court for each and every violation.

7. Defendants should be obligated to pay treble damages pursuant to the Act in addition to the penalty statutorily imposed per transaction.

## *FOURTH COUNT*

### *CONSPIRACY TO VIOLATE OF THE NEW JERSEY FALSE CLAIMS ACT*

1. Relator incorporates by reference all of the preceding paragraphs as if more fully set forth herein.

2. As set forth in the preceding paragraphs, the defendants have conspired with each other to defraud the state of New Jersey when they "knowingly made, used or

25

caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government". Relator seeks relief against the various defendants pursuant to the New Jersey False Claims Act, specifically, N.J.S.A. 2A:32C-1 et seq.

3. As set forth in the preceding paragraphs, the defendants are liable to the state for treble damages and a civil penalty of not less than and not more than the civil penalty allowed pursuant to the Federal False Claims Act in that the either had possession, custody or control of public property and money used or to be used by the State of New Jersey or knowingly presented or caused to be presented a false or fraudulent claim for payment or approval or violated some other sub-section of N.J.S.A. 2A:32C-3.

4. By reason of these false claims, the state of New Jersey has sustained damaged in an amount to be determined at trial.

5. By reason of these false claims, the defendants should be obligated to pay, pursuant to the provisions of the False Claims Act, a penalty amount to be determined by the court for each and every violation.

6. Defendants should be obligated to pay treble damages pursuant to the Act in addition to the penalty statutorily imposed per transaction.

### *PRAYER FOR RELIEF*

WHEREFORE, the Relator, on behalf of the United States, the State of New Jersey and other parties requests that judgment be entered in its favor and against the various defendants jointly and severally as follows:

a. On each of the claims for violation of the False Claims Act, 31 U.S.C. § 3729(a) et. seq. treble damages calculated in an amount to be determined at trial plus the maximum statutory penalty for each claim;

b. On each of the claims of the violation of the New Jersey False Claims Act, N.J.S.A. 2A:32C-1 et seq. treble damages calculated in an amount to be determined at trial plus the maximum statutory penalty for each claim;

c. The defendants should be obligated to pay the applicable fines, attorney's fees and costs associated with the violation of the law;

d. Compensatory damages;

e. Any other applicable consequential, incidental, nominal and expectation damages;

f. Lawful interest, attorney's fees, filing fees court costs and such other and further relief as the court shall deem equitable and just; and,

g. An Order granting such other relief as this court deems just and appropriate.

### *DESIGNATION OF TRIAL COUNSEL*

Pursuant to Rule 4:25-4, MICHAEL D. FITZGERALD, ESQUIRE is hereby designated as trial counsel for the Plaintiffs in the above-captioned matter.

### *DEMAND FOR JURY TRIAL*

Plaintiff/Relator on behalf of himself and the United States of America and the State of New Jersey demands a jury trial on all claims alleged herein.

MICHAEL D. FITZGERALD, ESQUIRE
Law Offices of Michael D. Fitzgerald
1 Industrial Way West, Unit B
Eatontown, New Jersey 07724
P.O. Box 1067
Oakhurst, New Jersey 07755
(732) 223-2200 – phone
mdfitz@briellelaw.com

Dated: March 16, 2020

28