*NOT FOR PUBLICATON*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* KEITH A. DILELLO, SR., STATE OF NEW JERSEY *ex rel*. KEITH A. DILELLO, SR.,<br><br>        Plaintiff,<br><br>     v.<br><br>HACKENSACK MERIDIAN HEALTH, JERSEY SHORE UNIVERSITY MEDICAL CENTER, OCEAN MEDICAL CENTER, SEAVIEW ORTHOPAEDICS, SHREWSBURY SURGERY CENTER, KESSLER REHABILITATION, DR. HALAMBROS DEMETRIADES, DR. THEODORE KUTZAN, DR. ADAM MYERS, DR. HOAN-YU NGUYEN, DR. FREDERICK DE PAOLA, ABC CORPORATIONS 1-10 (said names being fictitious), JOHN/JANE DOES 1-10 (said names being fictitious),<br><br>        Defendants. | Civil Action No. 20-02949 (FLW)<br><br>**OPINION** |

**WOLFSON, Chief Judge:**

In this *qui tam* action, Relator Keith A. DiLello, Sr. ("Relator" or "DiLello") sues numerous healthcare providers alleging violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, and similar state laws, stemming from claims submitted to the Government following an automobile accident. Before the Court are Defendants Kessler Institute for Rehabilitation's ("Kessler") and Shrewsbury Surgery Center's motions to dismiss Relator's complaint. (ECF Nos. 23 and 24.) Jersey Shore University Medical Center ("JSUMC"), Ocean Medical Center

("OMC"), and Hackensack Meridian Health ("HMH") (together, "HMH Defendants") separately move to dismiss the complaint.   (ECF No. 25.)  Relator opposes these motions.  (ECF No. 30.) For the reasons set forth below, Defendants' motions are **GRANTED**; however, in lieu of dismissal, Relator is given leave to amend his complaint within 30 days from the date of the accompanying Order.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

As the motions to dismiss only involve five of the named defendants, the factual background is limited to the five moving defendants' involvement as alleged in the complaint. Further, the Court considers "the complaint, exhibits attached to the complaint, [and] matters of public record, as well as undisputedly authentic documents [where] the complainant's claims are based on these documents." *Wolfington v. Reconstructive Orthopaedic Assocs. II PC*, 935 F.3d 187, 195 (3d Cir. 2019) (quoting *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010)).

On September 5, 2014, New Jersey resident Keith A. DiLello, Sr. ( "Relator") was involved in a car accident.  (ECF No. 1, Complaint ("Compl."), ¶ 19.)  At the time of the accident, Relator was covered by a no-fault personal injury protection ("PIP") policy issued by New Jersey Manufacturers Insurance Company ("NJM").  (*Id*. ¶ 19; Ex. C.)  Various health care professionals treated Relator for injuries that resulted from the accident for a period of approximately three years. (*Id*. ¶ 21.) Following the car accident, Oakhurst E.M.S. transported Relator to defendant JSUMC, a hospital within defendant HMH's system  (*Id*. ¶ 20.)  Relator allegedly remained at JSUMC for three days.  (*Id*. ¶ 25.)  Approximately three months later, on November 5, 2014, defendant Kessler

provided rehabilitation services to Relator.  (*Id*. ¶ 42(b).)  On December 8, 2014, a physician also provided services to Relator at defendant Shrewsbury Surgery Center.[1]  (*Id*. ¶ 42(i).)

The following year, on September 16, 2015, Relator underwent a surgical procedure at defendant OMC, another hospital within the HMH system.  (*Id*. ¶ 34.)  Relator alleges that HMH Defendants, Kessler, and Shrewsbury Surgery Center improperly billed, and received, payment for medical services from both Relator's primary insurer, NJM, and the Center for Medicare and Medicaid Services ("CMS") for the same service during the same dates and times.  (*Id*. ¶¶ 22-23).  As a result of this alleged practice, Relator avers that CMS is now seeking repayment from Relator's personal injury recovery for amounts it paid.  (*Id*. ¶ 24.)  The following is a breakdown of the alleged "double" billings with respect to each defendant as set forth by Relator's complaint and attached Explanation of Benefits exhibits:

- JSUMC billed NJM and CMS $30,623 each for Relator's three-day hospital stay from September 5, 2014 through September 8, 2014.  (*Id*. ¶ 26.)  The final approved amount under the New Jersey Fee Schedule was $19,106.91.  (Compl. Ex. A., ("PIP Pay Ledger").)  NJM allegedly paid $19,106.91.  (*Id*. ¶ 27.)  CMS  allegedly paid $23,352.91.  (*Id*. ¶ 28.)

- Kessler billed NJM and CMS $237.40 for Relator's treatment on November 5, 2014.  (*Id*. ¶ 42(b).)  The final approved amount under the New Jersey Fee Schedule was $52.50.  (Compl. Ex. A.)  NJM allegedly paid $42 after applying a $10.50 copay.  (Compl. ¶ 42(b).)  CMS allegedly paid $10.28 for the same service date.  (*Id*.)

---

[1]     The Complaint does not indicate the identity of the physician who provided services to Relator or the nature of the services.

- Shrewsbury Surgery Center billed NJM $6,674.00 and CMS $3,337.00 for care provided to Relator on December 8, 2014. (*Id*. 42(i).) The final approved amount under the New Jersey Fee Schedule was $1,257.93. (Compl. Ex. A.) NJM allegedly paid $1,192.83. (Compl. ¶ 42(i).) CMS allegedly paid $63.80. (*Id*.)

- OMC billed NJM and CMS $141,337.00 for the medical procedure Relator underwent on September 16, 2015. (*Id*. ¶ 35.) The final approved amount under the New Jersey Fee Schedule was $34,362.82. (Compl. Ex. A.) NJM allegedly paid $34,362.82 for the procedure. (*Id*. ¶ 35.) There is no indication from the complaint or attached exhibits that CMS paid any amount for the service.

Relator claims that he was unaware that Defendants were billing both NJM and CMS until he received "Explanation of Benefits" notifications. (*Id*. ¶ 23.). In essence, Relator argues that he should not have to repay CMS from his settlement because (1) CMS never should have been billed and (2) the sums were "effectively paid twice" by CMS and NJM. (*Id*. ¶ 24.). On March 17, 2020, Relator filed the instant Complaint under seal. (ECF No. 1.) Relator's Complaint includes four causes of action: violation of the federal and New Jersey False Claims Acts (Counts One and Three) and conspiracy to violate the federal and New Jersey False Claims Acts (Counts Two and Four). Thereafter, the United States and the State of New Jersey declined to intervene. (ECF No. 7.) In the instant matter, Defendants move to dismiss the complaint.

## II.    LEGAL STANDARD

A court may dismiss an action under Fed. R. Civ. P. 12(b)(6) if a plaintiff fails to state a claim upon which relief can be granted. When evaluating a Rule 12(b)(6) motion, the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may

be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).  A complaint survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

To determine whether a complaint is plausible, a court conducts a three-part analysis. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010).  First, the court "takes note of the elements a plaintiff must plead to state a claim." *Id*. (quoting *Iqbal*, 556 U.S. at 675). Second, the court identifies allegations that "are not entitled to the assumption of truth" because they are no more than conclusions.  *Id*. at 131 (quoting *Iqbal*, 556 U.S. at 679).  For instance, "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do," *Iqbal*, 556 U.S. at 678, nor am I compelled to accept "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007)).  Third, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Santiago*, 629 F.3d at 131 (quoting *Iqbal*, 556 U.S. at 680). This is a "context-specific task that requires the [ ] court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

An FCA complaint must also meet Fed. R. Civ. P. 9(b)'s heightened pleading standard. *See U.S. ex rel. Petras v. Simparel*, Inc., 857 F.3d 497, 502 (3d Cir. 2017).  In general, Rule 9(b) requires a plaintiff "to plead fraud with particularity, specifying the time, place and substance of the defendant's alleged conduct." *U.S. ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc.*, 149 F.3d 227, 234 (3d Cir. 1998); *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217

(3d Cir. 2002) (holding that a plaintiff must set forth the "who, what, when, where, and how" of the alleged fraud) (citation omitted). In the FCA context, however, a plaintiff must provide only "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Foglia v. Renal, Ventures Mgmt*., LLC, 754 F.3d 153, 157–58 (3d Cir. 2014). A plaintiff need not show "the exact content of the false claims in question," as "requiring this sort of detail at the pleading stage would be one small step shy of requiring production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates." *Foglia*, 754 F.3d at 156 (quotations and citation omitted).

## III.   DISCUSSION

### A.  False Claims Act

Under the FCA it is unlawful to knowingly submit a fraudulent claim to the federal government. *U.S. ex rel. Schumann v. Astrazeneca Pharm. L.P.*, 769 F.3d 837, 840 (3d Cir. 2014). "The primary purpose of the FCA is to indemnify the government-through its restitutionary penalty provisions-against losses caused by a defendant's fraud." *United States ex rel. Wilkins v. United Health*, 659 F.3d 295, 304 (3d Cir. 2011), *abrogated on other grounds as recognized in United States ex rel. Freedom Unlimited, Inc. v. City of Pittsburgh, Pennsylvania*, 728 F. App'x 101, 106 (3d Cir. 2018) (internal quotation marks and citation omitted). As such, the Act contains a *qui tam* provision that permits private parties (known as "relators") to bring suit "on behalf of the United States against anyone submitting a false claim to the [g]overnment." *Schumann*, 769 F.3d at 840 (internal quotation marks omitted) (quoting *Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939, 941 (1997) ). If a *qui tam* suit succeeds, the relator may share in the recovery.

To establish a prima facie FCA violation under section 3729(a)(1), a plaintiff must prove the following elements for each scheme: falsity, causation, knowledge, and materiality. *United States ex rel. Petratos v. Genentech, Inc.*, 855 F.3d 481, 487 (3d Cir. 2017).

### i.  False Claim

A claim is statutorily defined as "any request or demand . . . for money or property" that is presented to an "officer, employee, or agent of the United States." 31 U.S.C. § 3729(b)(2). Although the FCA does not define false or fraudulent, the Third Circuit has explained that "FCA falsity simply asks whether the claim submitted to the government as reimbursable was in fact reimbursable, based on the conditions for payment as set by the government." *U.S. ex rel. Druding v. Care Alts.*, 952 F.3d 89, 97 (3d Cir. 2020). An actionable claim may be either "factually false" or "legally false." *Id*. at 96–97. When the claimant misrepresents what goods or services it provided to the government, the claimant's claim is "factually false." *Wilkins*, 659, F.3d at 305. On the other hand, when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for government payment, the claim is "legally false." *Id.* "A legally false FCA claim is based on a 'false certification' theory of liability." *Id.* "Such certification may be express or implied." *United States ex rel. Whatley v. Eastwick Coll.*, 657 F. App'x 89, 94 (3d Cir. 2016). An entity makes an express false certification when it "falsely certif[ies] that it is in compliance with regulations which are prerequisites to [g]overnment payment in connection with the claim for payment of federal funds." *Wilkins*, 659, F.3d at 305. In contrast, an implied false certification arises when a defendant "seeks and makes a claim for payment from the [g]overnment without disclosing that it violated regulations that affected its eligibility for payment." *Id.*

In certain instances, a relator may pursue a fraudulent inducement theory of liability. "Although the focus of the False Claims Act is on false 'claims,' courts have employed a fraudulent inducement theory to establish liability under the Act for each claim submitted to the government under a contract which was procured by fraud, even in the absence of evidence that the claims were fraudulent in themselves." *United States ex rel. Thomas v. Siemens AG*, 593 F. App'x 139, 143 (3d Cir. 2014).

Here, Relator alleges that defendants violated the FCA by "a) billing CMS when other insurance is available, and b) by failing to return payment to CMS after payment by the 'other insurance.'"[2]  (Compl., First Count, ¶ 4.)  According to Relator, CMS should never have been billed when NJM provided coverage.  (Compl. ¶¶ 24, 29, 37, 42(b), 42(i).)  The Medicare Secondary Payer ("MSP") statute, 42 U.S.C. § 1395y, *et seq.* governs the submission of claims to Medicare in its capacity as a secondary payer where a primary plan exists.  Although Relator fails to specify the theory of falsity in his complaint, district courts in this Circuit have determined that FCA claims based on alleged violations of the Medicare Secondary Payer Act should be analyzed under an implied false certification theory.[3]  *See, e.g.*, *New Jersey Strong Pediatrics, LLC v.*

---

[2]      HMH argues that all claims against HMH should be dismissed it, because there are no allegations that HMH billed or received payments from NJM or CMS.  (*See* HMH Defendants' Motion to Dismiss ("HMH Defendants Moving Mot."), p. 25.)  The Court agrees that the complaint fails to distinguish between HMH and JSUMC.  (*See e.g.*, Compl. ¶¶ 29, 32 ("JSUMC and/or HMH should have returned the CMS payment." "JSUMC and/or HMH had an affirmative obligation to return the 'conditional payment.'"))  Relator's allegations with respect to HMH thus constitute an impermissible group pleading.  *See United States ex rel. Bennett v. Bayer Corp.*, No. 174188, 2022 WL 970219, at *7 (D.N.J. Mar. 31, 2022).  Rather, because there are no independent allegations that HMH billed CMS when other insurance was available or failed to return payment to CMS after payment by other insurance, and the exhibits attached to Relator's complaint do not list HMH as a payee or provider, HMH is dismissed as a defendant.

[3]      In his opposition brief, Relator argues that the theories of factual falsity and express legal falsity also apply to his claims, in addition to the theory of implied legal falsity.  (Relator's Br. in Opp'n. to Defendants' Mot. to Dismiss ("Relator Opp'n. Br."), pp. 8-10.)  "[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Frederico*

*Wanaque Convalescent Ctr.*, No. 14-6651, 2017 WL 2577544, at *4 (D.N.J. June 14, 2017) (construing relator's claim that defendants "fraudulently billed Medicare and Medicaid as primary payer despite the existence of alternative coverage, thereby violating secondary payor laws" as an implied false certification claim); *Negron v. Progressive Cas. Ins. Co.*, No. 14-577, 2016 WL 796888, at *6 (D.N.J. Mar. 1, 2016) (analyzing relator's claim that defendants "caused a claim to be submitted to Medicare which violated the Medicare Secondary Payor Act" under the implied false certification theory of falsity).

Prior to 1980, Medicare generally paid for medical services whether the recipient was also covered by another health plan. *See Fanning v. United States*, 346 F.3d 386, 388 (3d Cir. 2003). In 1980, Congress enacted the MSP Act to cut health care costs and lower Medicare disbursements by assigning primary responsibility for medical bills of Medicare recipients to private health plans. *Id.* at 388–89. In the context of no-fault insurance plans, such as the PIP policy issued by NJM here, the Medicare Secondary Payment Manual published by CMS allows Medicare to pay for medical bills when the no-fault insurance is billed first and does not pay the entire bill:

> If services are covered under no-fault insurance, that insurance must be billed first. <u>If the insurance does not pay all of the charges, a claim for secondary Medicare benefits can be submitted.</u> Medicare can pay for services related to an accident if benefits are not available under the individual's no-fault insurance coverage because that insurance has paid maximum benefits for the accident on items or services not covered by Medicare or on non-medical items such as lost wages.

---

*v. Home Depot*, 507 F.3d 188, 202 (3d Cir. 2007) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984)). Because the complaint does not allege that defendants "misrepresent[ed] what goods or services that it provided to the [g]overnment," *Wilkins*, 659 F.3d at 305, a false certification theory is irrelevant to Relator's claims. Moreover, Relator alleges no facts in the complaint suggesting that defendants falsely certified compliance with regulations that are prerequisites to Government payment, as required under an "express false certification" theory. *Id*.

*Medicare Secondary Payer (MSP) Manual*, Chapter 2 § 60 (implemented May 8, 2006) (emphasis

added).   Additionally, section 1395y(b)(4) of the MSP Act plainly allows payment for the

remainder of a service charge "[w]here payment for an item or service by a primary plan is less

than the amount of the charge for such item or service and is not payment in full . . . ."  However,

the MSP Act bars Medicare payments where "payment has been made or can reasonably be

expected to be made . . . under no fault insurance." 42 U.S.C. § 1395y(b)(2)(A)(ii).

There appears to be no dispute by the parties that claims were submitted for payment to

CMS.  Thus, this Court must first determine whether the claims submitted by Defendants were

false or fraudulent.

Beginning with defendant Kessler, Relator alleges that Kessler billed NJM and CMS in the

amount of $237.40 for his treatment on November 5, 2014.  (Compl. ¶ 42(b).)  Healthcare

providers who accept payment under PIP policies are limited by the State of New Jersey in the

amount that can be charged for services, pursuant to a payment schedule tied to the insured's

diagnoses.  N.J. Rev. S. § 39:6A-4.6.[4]  The PIP Pay Ledger, which was attached to the complaint,

shows that the Kessler was entitled to $52.50 under the New Jersey fee schedule.  (Compl. Ex. A.)

NJM allegedly paid $42.00 after applying a $10.50 co-pay.  (Compl. ¶ 42(b).)  CMS allegedly paid

$10.28.  (*Id*.)  As for Shrewsbury Surgery Center, Relator alleges that that Shrewsbury billed NJM

$6,674.00 and CMS $3,337.00 for care Relator received on December 8, 2014.  (*Id*. ¶ 42(i).)  The

final approved amount under the New Jersey Fee Schedule was $1,257.93.  (Compl. Ex. A.)  NJM

allegedly paid $1,192.83.  (Compl. ¶ 42(i).)  CMS allegedly paid $63.80.  (*Id*.)  Unsurprisingly, in

both instances, together the NJM and CMS payments total the fee schedule amount.

---

[4]     N.J.S.A. 39:6A–4.6 mandates that no-fault policies reimburse healthcare providers pursuant to medical fee schedules.  The amount reimbursable to healthcare providers pursuant to the fee schedules is less than the charge for services rendered by providers.

Nevertheless, Relator argues that Kessler and Shrewsbury Surgery Center "should not have billed CMS when NJM provided coverage." (Compl. ¶¶ 42(b), 42(i).) However, beyond this single allegation, Relator provides no additional facts to suggest falsity. Rule 9(b) typically requires plaintiffs to alleging fraud to support their allegations "with all of the essential factual background that would accompany 'the first paragraph of any newspaper story'—that is the 'who, what, when, where and how' of the events at issue.'" *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (quoting *In re Rockefeller Ctr. Props., Inc. Securities Litig.*, 311 F.3d at 217.

In this case, the Complaint fails to specify the "when" critical to Relator's claims—*i.e.*, the approximate dates the claims were submitted to CMS or the dates CMS reimbursed defendants, or the "how" of the alleged double billing. Beyond the fact that CMS was billed for services, presumably as the secondary insurance, Relator fails to allege any other facts that tend to make such a billing improper or unnecessary such that it would amount to a false claim made to the Government.

Indeed, section 1395y(b)(4) ("Coordination of Benefits") of the MSP Act permits a provider, such as Kessler or Shrewsbury Surgery Center, to submit a claim to Medicare if a primary payer does not pay the full amount allowed under the New Jersey fee schedule. In that regard, the fact that Kessler or Shrewsbury Surgery Center billed Medicare for the charges not paid by the primary payer, *i.e.*, NJM, is a reasonable explanation for the alleged Medicare payments at-issue. Inexplicably, Relator offers no other facts or theories to suggest that these defendants billed Medicare for the amounts NJM had already paid. As they stand now, the facts as alleged do not establish any inference, let alone a "strong inference," that false claims were submitted. *Foglia*, 754 F.3d at 158. Accepting the allegations in the complaint and the attached exhibits as true, I

cannot find, under the heightened pleading requirements of Rule 9(b), that Relator sufficiently pled falsity as to his claims against Kessler or Shrewsbury Surgery Center; instead based on the exhibits and the pleadings it appears that Kessler and Shrewsbury Surgery Center submitted claims to Medicare as a secondary payer <u>after</u> primary payer, NJM, made a payment for less than the permitted charge in accordance with the MSP Act.  *See United States v. Omnicare, Inc.*, 903 F.3d 78, 91-92 (3d Cir. 2018) (explaining that "the possibility of a legitimate explanation undermines the strength of the inference of illegality").  Accordingly, Relator has not plausibly alleged the submission of a false claim by Kessler or Shrewsbury Surgery Center.

Relator also alleges improper "double billing" by the HMH Defendants.  According to Relator's complaint, JSUMC billed NJM and CMS $30,623 each for Relator's three-day hospital stay from September 5, 2014 through September 8, 2014.  (Compl. ¶ 26.)  The final approved amount under the New Jersey Fee Schedule was $19,106.91.  (Compl. Ex. A.)  NJM allegedly paid $19,106.91.  (*Id*. ¶ 27.)  On the other hand, in response to the hospital bill, CMS allegedly paid $23,352.91.[5]  (*Id*. ¶ 28.)  Relator argues that "JSUMC should not have billed CMS pursuant to 42 U.S.C. 1395y(b)(2)(A)(ii) at all." (*Id*. ¶ 29.)  According to Relator, payment may not be made under Section 1395y(b)(2)(A)(ii) to the extent that "payment has been made or can reasonably be expected to be made . . . under no fault insurance."

JSUMC offers another plausible explanation for the payments.  JSUMC avers that the requested payments from both NJM and CMS were permissible under the Conditional Payment Exception, 42 U.S.C. § 1395y(b)(2)(B)(i)-(ii).  The Conditional Payment Exception provides that "if a primary plan . . . has not made or cannot reasonably be expected to make payment with respect

---

[5]    There is no explanation by Relator why Medicare issued payment in this particular amount. Relator also does not allege or argue that this payment was not made in response to JSUMC's billing for Relator's hospital stay.

to [an] item or service promptly (as determined in accordance with regulations)," the secondary payer, Medicare, may make a conditional payment. *Id.* (emphasis added)  A "Prompt" payment is defined in the applicable regulations as payment made within 120 days of either the date on which care was provided or when the claim was filed with the insurer, whichever is earlier. *See* 42 C.F.R. §§ 411.21, 411.50.  In the case of inpatient hospital services, CMS considers the date of discharge. 42 C.F.R. § 411.50.

Here, HMH Defendants cite to the PIP Pay Ledger attached to the Complaint, which indicates that NJM did not issue a payment of $19,106.91 to JSUMC for care provided on September 5 through September 8, 2014, until July 22, 2015, more than seven months after the date of service.  (Compl. Ex. A.)

Relator appears to concede that the payment from CMS was a conditional payment.  (*See* Compl. ¶ 32 ("JSUMC and/or HMH had an affirmative obligation to return the "conditional payment.""))  However, Relator responds that the Conditional Payment Exception does not apply to JSUMC, because the PIP Pay Ledger indicates that NJM did not "receive" the bill for services rendered until March 27, 2015.  (*See* Relator Opp'n Br., pp. 7-8.)  JSUMC disputes the billing receipt date; it contends that the billing date must be before March 27, 2015, given that an Explanation of Benefits letter from NJM advised Relator that as of July 22, 2015, NJM had already "reviewed all of the supporting documentation" submitted with Relator's appeal and had decided "no additional payment is forthcoming."  (Compl., Ex C., July 22, 2015 Letter.).  Additionally, HMH Defendants cite a Coordination of Benefits letter from JSUMC that advised Novitas Medicare, a third-party contractor handling the administration of Medicare claims, that as of December 30, 2014, NJM was the "primary insurance on this claim," and "Medicare is secondary

to this claim."[6]  (*See* December 30, 2014 JSUMC Explanation of Benefits Letter.)  The letter also states "payment amt: no payment," from which it could be inferred that as of December 2014, no payment was received from NJM or no payment was being sought from Medicare.  Regardless, whether the bill was received by NJM on March 27, 2015, as Relator maintains, or on an earlier date as HMH Defendants contend, the fact is immaterial to the applicability of the Conditional Payment Exception, 42 U.S.C. § 1395y(b)(2)(B)(i)-(ii).

None of the parties dispute that the date of service was September 5 through September 8, 2014, or that NJM ultimately issued payment in July 2015.  As stated *supra*, CMS regulations measure the commencement of the 120-day prompt period by the date of discharge in the case of inpatient hospital stays, not the date the bill is "received" by the primary insurer.  Accordingly, because NJM did not make payment to JSUMC until well past the 120-day "prompt" period, it is plausible, and conceded by Relator, that the Conditional Payment Exception applied, such that Medicare's payment was presumably made under section 1395y.  But, importantly, apart from the July 22, 2015 NJM payment date, there are no other facts or allegations in Relator's complaint or exhibits that suggest CMS fraudulently paid the bill within the prompt pay period before NJM, or after NJM paid in full the allowable amount under the fee schedule.  Thus, Relator's allegations are insufficient to plead falsity on the part of JSUMC.[7]

---

[6]     As this document is integral to Relator's double billing claim against JSUMC, the Court may properly consider it.  *Popejoy v. Sharp Elecs. Corp.*, No. 14-06426, 2015 WL 5545067, at *4 (D.N.J. Sept. 18, 2015) (considering cartoons because they were "integral" to plaintiffs' consumer fraud claims).

[7]     Relator separately argues that Defendants violated the FCA by allegedly failing to return the CMS payments.  (Compl. ¶¶ 29, 33.)  A provider is required to reimburse Medicare for a conditional payment "if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service."  42 U.S.C. § 1395y(b)(2)(B)(ii).  If a provider "receives payment for the same services from Medicare and another payer that is primary to Medicare," the provider will "reimburse Medicare any overpaid amount within 60 days." 42 C.F.R.

The allegations against OMC are materially different than those against JSUMC.  Relator alleges that OMC billed NJM and CMS $141,337.00 for a medical procedure Relator underwent on September 16, 2015.  (Compl. ¶ 35.)  The New Jersey Fee Schedule permitted payment of $34,362.82.  (Compl. Ex. A.)  NJM allegedly paid $34,362.82 for the procedure on February 13, 2017, almost a year and five months after the date of Relator's medical procedure.  (*Id.*)  However, Relator does not allege that CMS ever paid OMC.  And OMC is not listed on the CMS Payment Summary Form attached to Relator's complaint.  (*See* Compl. Ex. B.) The purpose of the False Claims Act "was to provide restitution to the government of money taken from it by fraud." *Hutchins v. Wilentz*, 253 F.3d 176, 184 (3d Cir. 2001) (citing *United States v. Bornstein*, 423 U.S. 303, 314 (1976)).  As such, unless claims "would result in economic loss to the United States government, liability under the False Claims Act does not attach."  *Hutchins*, 253 F. 3d at 184. Accepting all allegations against OMC as true, no inference can be made that CMS ever suffered an economic loss as a result of a claim submitted by OMC.  Therefore, OMC is dismissed as a defendant.

### ii.  Materiality

To incur liability for submitting a false claim, that claim must be material to the government's decision to pay.  Even assuming *arguendo* that Relator had sufficiently pled false or fraudulent claims—which he has not—Relator has not adequately alleged materiality.  The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the

§ 489.20(h).  However, failure to reimburse CMS cannot serve as the basis of an affirmative FCA violation on its own; pursuant to sections 3729(a)-(b), a violation of the 60-day period does not involve a claim presented to the United States for payment that was "false or fraudulent." *U.S. ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 (3d Cir. 2004).  Moreover, the MSP Act explicitly anticipates late payments beyond the 60-day repayment window. 42 U.S.C. § 1395y(b)(2)(B)(ii) ("the Secretary may charge interest (beginning with the date on which the notice or other information is received) on the amount of the reimbursement until reimbursement is made . . . .").

payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The materiality standing is "rigorous" and "demanding." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192, 194 (2016). In *Escobar*, the Supreme Court clarified how the materiality requirement should be implemented. *Id*. The Court explained that materiality may be found where "the [g]overnment consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." *Id*. at 195. Conversely, it is "very strong evidence" that a requirement is not material "if the [g]overnment pays a particular claim in full despite its actual knowledge that certain requirements were violated." *Id*.

To meet this element, Relator must allege facts showing that the Government's decision to pay would have been influenced by the knowledge that Defendants had not complied with secondary payer obligations under the MSP Act. *Petratos*, 855 F.3d at 489–92 (affirming district court's dismissal of FCA claim alleging drug manufacturer caused physicians to submit Medicare claims that were not "reasonable and necessary" because there were "no factual allegations showing that CMS would not have reimbursed these claims"). In *Petratos*, the Third Circuit found that the plaintiff could not establish materiality, in part, because plaintiff "failed to plead that CMS 'consistently refuses to pay' claims like those alleged." *Id*. at 490.

Here, too, Relator's complaint does not aver that Defendants' alleged statutory violations were "material." In particular, the complaint does not allege that CMS would not have paid the claims at issue had it known that NJM was Relator's primary insurer and that NJM had paid a portion of certain claims or the entire bill for some claim. What is more, Relator alleges that defendants "routinely engage" in a scheme by which they submit medical bills to New Jersey insurers and CMS for the same medical treatment. (Compl. ¶ 4.) As pled, Relator has not alleged

that CMS "consistently refuses to pay claims" based on noncompliance with section 1395y(b)(2)(A) (barring Medicare payment where "payment has been made or can reasonably be expected to be made . . . under no fault insurance"). Rather, in almost every alleged improper payment example Relator cites, CMS is alleged to have paid Defendants. (*See* Compl. Ex. B.) As a result, the inference may be drawn that CMS may even be "consistently reimburs[ing] these claims" with knowledge of the alleged noncompliance. *Petratos*, 855 F.3d at 490. Accordingly, Relator has also failed to satisfy the FCA's materiality requirement.[8]

### B.  Reverse False Claim under Section 3729(a)(1)(G)

Although Relator's complaint does not specify which sections of the FCA defendants allegedly violated, it appears that Relator also seeks to assert a reverse false claim. In such a claim, the "fraud or falsity is in service of avoiding a flow of funds to the government, rather than from." *U.S. ex rel. Portilla v. Riverview Post Acute Care Ctr.*, No. 12-1842, 2014 WL 1293882, at *9 (D.N.J. Mar. 31, 2014).

Section 3729(a)(1)(G) imposes liability on any person who

> knowingly makes, uses, or causes to be made or used, a false record
> or statement material to an obligation to pay or transmit money or
> property to the Government, <u>or</u> knowingly conceals or knowingly
> and improperly avoids or decreases an obligation to pay or transmit
> money or property to the Government.

31 U.S.C. § 3729(a)(1)(G) (emphasis added). Section 3729(a)(1)(G) is referred to as the "reverse false claims" section of the FCA, because it targets a defendant's "fraudulent effort to reduce a liability owed to the government rather than to get a false or fraudulent claim allowed or paid." *U.S. ex rel. Atkinson v. PA. Shipbuilding Co.*, 473 F.3d 506, 513 n. 12 (3d Cir. 2007).

---

[8]     Defendants further argue that Relator does not sufficiently allege that they knowingly violated the FCA, but I need not analyze this issue here, as Relator has failed to plausibly allege falsity and materiality.

Here, Relator alleges that "the various defendants 'knowingly made, used or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government'[9] by billing CMS for medical treatment related to an automobile accident." (Compl., First Count, ¶ 4.) To the extent that Relator's reverse FCA claim involves a false record or statement, it is dismissed as duplicative of the affirmative FCA claim. *See United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 171–72 (E.D. Pa. 2012) (noting that the purpose of the FCA's reverse false claims provision "was not to provide a redundant basis to state a false claim under [other provisions of the FCA]"); *United States ex rel. Thomas v. Siemens*, 708 F. Supp. 2d 505, 514–15 (E.D. Pa. 2010) (same). To bring a claim under the second half of Section 3729(a)(1)(G), "a plaintiff must allege that (1) there is an obligation to pay or transmit money or property (2) to the Government, which the defendant (3) knowingly and improperly (4) avoided or decreased." *United States v. Simparel, Inc.*, No. 132415, 2015 WL 7313861, at *5 (D.N.J. Nov. 20, 2015), *aff'd sub nom. United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497 (3d Cir. 2017).

Here, Relator's claims fall short of alleging the necessary elements. With respect to Kessler and Shrewsbury Surgery Center, Relator does not allege an "obligation" to pay the Government. The FCA defines an obligation as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any

---

[9]     Relator appears to be quoting an outdated version of the FCA. In May 2009, Congress amended the FCA with the passage of the Fraud Recovery Act of 2009 (the "FERA"). Pub. L. No. 111–21, 123 Stat. 1617 (2009); *Wilkins*, 659 F.3d at 303. The amendments to the FCA generally apply to conduct arising after the date of enactment of the FERA. Pub. L. 111-21, 123 Stat 1617 (2009) § 4(f), 31 U.S.C. § 3729 note. Because Relator alleges violations of the FCA that occurred after the passage of the FERA, his claims are analyzed under the revised text of the FCA. *See supra*.

overpayment." 31 U.S.C. 3729(b)(3). The only allegations specific to Kessler and Shrewsbury Surgery Center in the complaint are that they "should not even have billed CMS when NJM provided coverage." (Compl. ¶¶ 42(b), 42(i).) These allegations are insufficient as they merely recast Relator's affirmative claim that these defendants billed CMS when other insurance was available and failed to return payment to CMS. *See United States ex rel. Petratos v. Genentech, Inc.*, 141 F. Supp. 3d 311, 322 (D.N.J. 2015), *aff'd*, 855 F.3d 481 (3d Cir. 2017) (dismissing reverse false claims where allegations suffered from the same flaw as the false statement claims: failure to plausibly show an obligation to pay funds to the government).

Relator's allegations concerning HMH Defendants are also inadequate. As stated *supra*, Relator alleges that NJM paid $19,106.91 and CMS paid $23,352.91, in response to JSUMC's billing.[10] (Compl. ¶¶ 27-28.) Additionally, Relator alleges that a conditional payment of $5,109.04 made by CMS was unreimbursed as of October 5, 2018 and that JSUMC had "an affirmative obligation to return the 'conditional payment.'" (Relator Opp'n. Br. p. 8.; Compl. ¶ 32). For support of that allegation, Relator relies on a CMS Payment Summary Form, attached to the complaint as Exhibit B, that shows a "reimbursed amount" of $5,109.04 associated with JSUMC. (Compl. Ex. B.)

To bring a claim under the FCA, the elements of the cause of action must be pled "with particularity" to satisfy Rule 9(b)'s heightened pleading standard. Fed. R. Civ. P. 9(b); *Wilkins*,

---

[10]    Relator's allegation as to what CMS paid is entirely confusing. First, there are no documents attached to the complaint that show that CMS actually paid $23,352.91 to JSUMC on behalf of Relator. Further, the PIP Pay Ledger shows that NJM paid a total of $23,352.91. (Compl. Ex. A.) Adding to the confusion is a CMS Payment form, discussed *infra*, that suggests Medicare paid $5,109.04. (*Id.*, Ex. B.) This amount appears to contradict Relator's allegation that Medicare paid $23,352.91. Nonetheless, for the purposes of this motion, the Court will accept Relator's allegations as true. And even accepting those allegations as true, Relator does not state a reverse false claim. *See infra*.

659 F.3d, at 301 n. 9 (citing *SmithKline Beecham Clinical Lab'ys*, 149 F.3d at 234).  To that end, description of "a mere opportunity for fraud will not suffice."  *Foglia*, 754 F.3d at 158–59.  Rather plaintiffs must provide "sufficient facts to establish a plausible ground for relief."  *Id*. at 159 (citations and internal quotation marks omitted).

There are several issues with Relator's alleged theory.  First, although Relator argues that the CMS Payment Form shows the $5,109.04 amount as a "'conditional payment' and unreimbursed as of October 5, 2018," Relator does not allege that the conditional payment remains unreimbursed today.  (Relator Opp'n Br., p. 10.)  This fact is significant because as the Court stated *supra*, even if CMS is reimbursed outside of the 60-day reimbursement period, no false claim arises from mere late payment.  But most importantly, the complaint fails to allege that JSUMC, or any of the remaining HMH Defendants, "knowingly conceal[ed] or knowingly and improperly avoid[ed] or decreas[ed] an obligation to pay" the Government.  31 U.S.C. § 3729(a)(1)(G).  The plain meaning of "avoid" encompasses behavior where an individual is put on notice of a potential issue, is legally obligated to address it, and does nothing."  *Kane ex rel. U.S. v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 394 (S.D.N.Y. 2015) (the government adequately pleaded that defendants avoided returning overpayments where complaint alleged software glitch was brought to defendants' attention); *see also United States v. Lakeshore Med. Clinic, Ltd.,* No. 11 00892, 2013 WL 1307013, at *4 (E.D. Wis. Mar. 28, 2013) (finding relator had stated a reverse claim under section 3729(a)(1)(G) where defendant ignored audits disclosing a high rate of improper upcoding by physicians).  Here, Relator has not alleged non-payment by JSUMC despite notice, such as collection attempts or other statements from CMS.  In sum, Relator does not state a plausible reverse FCA claim.

### C.  State Law Claims

Relator's remaining claim is a state law claim under the NJFCA. (*See* Compl., Count III.) However, the Court has dismissed Relator's federal claim to the extent it presented an affirmative or reverse claim under the FCA. Because Relator does not differentiate between the state and FCA claims, these claims fail for the same reasons as the federal FCA claim discussed *supra*.[11] *See Petratos*, 141 F. Supp. 3d at 322 (dismissing state claims where plaintiff provided no allegations or analysis differentiating state claims from dismissed FCA claims).

Separately, the Court notes that Relator did not allege that he was eligible for New Jersey Medicaid benefits or that the Defendants received any state funds. Relator's claim that "Medicare claims are paid, in part, by the state" is incorrect. (Relator Opp'n. Br., p. 24.) States do not participate in Medicare. See *Pennsylvania Med. Soc. v. Marconis*, 942 F.2d 842, 843 (3d Cir. 1991) ("Medicare is funded by the federal government without state administrative or financial participation."); *State of Fla. v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1275 (11th Cir. 2021) (explaining that "Medicare, which is funded entirely by the federal government, covers individuals who are over age 65 or who have specified disabilities [while] Medicaid, which is funded by the federal government and the States, covers eligible low-income individuals, including those who are elderly, pregnant, or disabled").

## IV.    CONCLUSION

For the reasons stated herein, Defendants' motions to dismiss are granted. Relator's claims are dismissed without prejudice. To the extent that Relator believes he may cure the deficiencies

---

[11]     As noted *supra*, Relator alleges conspiracy violations in addition to violations of the federal and New Jersey False Claims Acts. (*See* Compl., Counts II and IV.) However, "[w]ithout an underlying violation, there can be no liability for conspiracy under the FCA." *Petratos*, 141 F. Supp. 3d at 317 n. 3.

in his claims discussed above, he is given leave to amend his complaint within 30 days from the date of the accompanying Order.

**DATED**: April 29, 2022

<u>/s/ Freda L. Wolfson</u>
Hon. Freda L. Wolfson
U.S. Chief District Judge